**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **MARSHIELA SOWARDS,** ) | |
| **on behalf of herself and her minor children,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:07-cv-0354** |
| ) | **Judge Trauger** |
| **GRANGE MUTUAL CASUALTY COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

Pending before the court is the Plaintiff's Motion for Partial Summary Judgment (Docket

Nos. 63 and 64), to which the defendant has responded (Docket No. 88).  Also pending is the

Defendant's Motion to Dismiss and for Partial Summary Judgment on Plaintiff's Claims for

Statutory Bad Faith Penalty, Tennessee Consumer Protection Act, Negligence, Defamation and

Unjust Enrichment (Docket Nos. 67 and 68), to which the plaintiff has responded (Docket Nos.

91 and 92), and the defendant has replied (Docket No. 95.)  For the reasons discussed herein, the

plaintiff's motion will be denied and the defendant's motion will be granted.

## FACTS

This case arises from a fire that destroyed the home of the plaintiff, Marshiela Sowards,

and her minor children on November 24, 2005.[1]  The property, located at 1455 Wolf Branch

---

[1]Unless otherwise noted, the facts are drawn from Defendant's Responses to Plaintiff's
Statement of Undisputed Facts in Support of her Motion for Summary Judgment (Docket No.
89), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No.
93), and Defendant's Responses to Plaintiff's Additional Statement of Material Facts (Docket

1

Road in Vanleer, Tennessee, had been insured under a farm owner insurance policy issued by the defendant, Grange Mutual Casualty Company ("Grange"). Grange issued the policy to Ms. Sowards and her then-husband, Kenneth Sowards, in April 1999. Until the time of the fire, either Ms. Sowards or Mr. Sowards made all of the appropriate payments on the policy. After the policy was issued, but prior to the fire, Ms. Sowards and Mr. Sowards divorced.[2] As part of the divorce settlement, Ms. Sowards retained the property, although the settlement required that she refinance the property within two years of the final divorce decree, at which time Mr. Sowards would convey by quitclaim deed all of his rights, title, and interest in the property to Ms. Sowards. (Docket No. 4 Ex. B.) Ms. Sowards became legally obligated for the mortgage and other expenses relating to the property on September 1, 2005.

On the morning of November 24, 2005, Ms. Sowards left her home to drive to Killen, Alabama for the Thanksgiving holiday.[3] At some time between 10:45 a.m. and 11:15 a.m., a fire

---

No. 96). Facts are also drawn from the Defendant's Statement of Additional Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment (Docket No. 90), which will be treated as undisputed for the purpose of summary judgment, as the plaintiff never submitted a response. *See* M.D. Tenn. R. 56.01(g).

[2]The final divorce decree was entered on October 24, 2005. (Docket No. 4 Ex. B.)

[3]The parties dispute the precise time at which Ms. Sowards left her home. (*See* Docket No. 89 ¶ 1.) Ms. Sowards claims that she left between 9:00 and 10:30 a.m. (Docket No. 89 ¶ 1; Docket No. 64 at 1.) Grange asserts that, given Ms. Sowards' deposition testimony and a receipt placing her in Lawrenceburg, Tennessee at 12:41 p.m., she could have left her home no earlier than 9:41 a.m., and may have left as late as 11:00 a.m. (Docket No. 89 ¶ 1; Docket No. 88 at 12-14.)

2

was discovered at the house.[4]  The fire department was dispatched to the scene at 11:15 a.m. and extinguished the fire.  (Docket No. 66 Ex. D.)

On November 25, 2005, Ms. Sowards returned from Alabama and submitted a claim in the amount of $232,898.00 to Grange under her insurance policy.  Adjuster Bill Kennedy was assigned to handle the claim and undertook an investigation of the fire.  As part of this investigation, Grange engaged Rick Eley, an independent cause and origin expert, to examine the scene of the fire and determine the cause and origin of the fire, as is standard with any large fire loss.[5]  Mr. Eley determined that the fire had started in the kitchen and that the fire was incendiary in origin, "occurring as a result of someone pouring a flammable or combustible liquid substance inside the home and igniting same."  (Docket No. 66 Ex. F at 4.)  Additionally, as part of its investigation, Grange conducted examinations under oath ("EUOs") of Ms. Sowards, Mr. Sowards, and several of their children, as provided for by the insurance policy.  Grange also spoke to a number of individuals who suggested that Ms. Sowards may have been responsible for the fire.[6]

After conducting its investigation, Grange convened a meeting of its loss review committee to review Ms. Sowards' claim.  At such meetings, which are not recorded, the claim

---

[4]A report prepared by Grange's expert indicates that a neighbor noticed the fire at 11:14 a.m. and called the fire department.  (Docket No. 66 Ex. F.)  Mr. Sowards stated, however, that he learned of the fire at 10:45 a.m., arrived at the house before the fire department, and kicked in a door to see if anyone was inside.  (Docket No. 75 at 51, 57, 61.)

[5]Although Ms. Sowards filed a motion to exclude Mr. Eley's testimony (Docket No. 51), that motion has been denied and his report and testimony will not be excluded (Docket No. 98).

[6]The details of the defendant's investigation, including Mr. Eley's findings and conclusions and the contents of the EUOs and witness statements, are discussed in further detail in Sections II and III *infra*.

3

investigator presents evidence for the committee to consider and makes a recommendation as to whether the claim should be denied; the committee must vote unanimously to deny a claim. Following the meeting, Grange issued a letter dated October 13, 2006 denying Ms. Sowards' claim on the grounds that Ms. Sowards intentionally caused the fire, or procured another individual to cause the fire. (Docket No. 4 Ex. D.)

## ANALYSIS

Ms. Sowards brought this lawsuit on behalf of herself and her minor children in the Circuit Court for Dickson County Tennessee, asserting that Grange's conduct constitutes a breach of contract, bad faith refusal to pay an insurance claim, violation of the Tennessee Consumer Protection Act, negligence, defamation, and unjust enrichment. Grange removed the action to this court. (Docket No. 1.) After Ms. Sowards filed an Amended Complaint (Docket No. 4), Grange answered, asserting a number of defenses, including the defense of arson (Docket No. 12).

Ms. Sowards now seeks partial summary judgment with respect to her breach of contract claim, and Grange seeks summary judgment with respect to the remainder of Ms. Sowards' claims.[7] As Ms. Sowards concedes that summary judgment is appropriate as to her defamation and unjust enrichment claims (Docket No. 92 at 16), the only claims remaining for analysis are breach of contract, bad faith refusal to pay an insurance claim, violation of the Tennessee Consumer Protection Act, and negligence.

---

[7]In its motion, Grange sought either a motion to dismiss under Rule 12(b)(6) or, in the alternative, summary judgment under Rule 56. (Docket Nos. 67, 68.) As Grange's motion is based not only on the pleadings, but also on depositions and discovery conducted in this matter, however, the motion will be treated as a motion for summary judgment rather than as a motion to dismiss.

4

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac*

5

*Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Breach of Contract

Ms. Sowards seeks summary judgment with respect to her breach of contract claim, asserting that Grange cannot establish the elements required to succeed on a defense of arson. (Docket No. 64 at 2-6.)

To establish an arson defense, an insurer "must show by a preponderance of the evidence that the loss was due to a fire of incendiary origin, that the insured had an opportunity to set the fire, and that [the insured] had a motive to do so." *McReynolds v. Cherokee Ins. Co.*, 815 S.W.2d 208, 211 (Tenn. Ct. App. 1991); *see also Mathis v. Allstate Ins. Co.*, No. 91-5754, 1992 U.S. App. LEXIS 7130, at *5 (6th Cir. Apr. 8, 1992) (citing *McReynolds*). The insurer must carry its burden with respect to each of the three elements of the arson defense. *Guess v. Grange Mut. Cas. Co.*, No. 4:05-cv-40, 2007 U.S. Dist. LEXIS 73368, at *20 (E.D. Tenn. Sept. 28, 2007) (citing *Walters v. Tenn. Farmers Mut. Ins. Co.*, 873 S.W.2d 691 (Tenn. Ct. App. 1993)). As arson cases are difficult to prove, in civil cases, arson may be established by reliance on circumstantial evidence. *Arms v. State Farm Fire & Cas. Ins. Co.*, 731 F.2d 1245, 1249 (6th Cir. 1984). Where a party relies on circumstantial evidence to prove its case, "the facts and circumstances shown by the evidence and relied on to sustain [the party's] theory must not only be consistent with that theory, but must also be inconsistent with any other reasonable theory.

6

However, they need not be so certain as to exclude all other rational theories. A preponderance of such circumstantial evidence is all that is required in a civil case." *Aetna Cas. & Sur. Co. v. Parton*, 609 S.W.2d 518, 520 (Tenn. Ct. App. 1980).

A.    *Incendiary Origin*

In the course of its investigation of the fire, Grange hired Mr. Eley to determine the cause and origin of the fire. Mr. Eley's report states:

> From an examination of the charred remains of wood, debris and other materials in the home, it was determined that the fire originated in and/or around the kitchen area. This was established by the heavily damaged appliances in the kitchen area    when compared to similar metal products throughout the remainder of the home . . . . We removed the cook stove and examined it, discovering that the heaviest amount of fire damage was on the right front side of the cook stove. This damage was so intense, that it <u>could not</u> have been caused by normal temperatures produced in a residential fire. This amount of damage can only occur as the result of a flammable liquid, chemical or accelerant. The stove may have been used as a time delay device to allow the perpetrator to have ample time to leave the home, before the fire began.

(Docket No. 66 Ex. F at 2 (emphasis in the original).) Although laboratory tests revealed "no identifiable accelerants" in samples of debris that Mr. Eley took from the scene, he noted that "[t]his does not mean there were no accelerants used in the burning of this home, but merely there none [*sic*] found in sufficient quantities in the debris samples collected to make a positive identification." (Docket No. 66 Ex. F at 3.) Mr. Eley subsequently concluded that "[a]ll physical evidence indicates that this fire is Incendiary in Origin, occurring as the result of someone pouring a flammable or combustible liquid substance inside the home and igniting same." (Docket No. 66 Ex. F at 4.)

Although Ms. Sowards attempts to undermine Mr. Eley's credibility by noting that Grange frequently hired Mr. Eley to make cause and origin determinations, she provides no

7

evidence — other than her own speculation — to suggest that his investigation or findings were biased. (Docket No. 64 at 3.) Ms. Sowards also notes that Mr. Eley's report constitutes the "only evidence" supporting the conclusion that the fire was of an incendiary origin and that the fire department report, by contrast, concluded that the fire was "undetermined" and that no human factors contributed to the fire. (Docket No. 64 at 2; Docket No. 66 Ex. D.) However, the fire department report was not a cause and origin report and thus was not based on the kind of in-depth analysis as was Mr. Eley's report. (*See* Docket No. 88 at 7; Docket No. 89 ¶¶ 13-14; Docket No. 90 ¶ 10.) Moreover, the fire department report's notation that no human factors contributed to the fire does not appear to rule out arson, as the possible "human factors" listed under that subheading included factors such as physical and mental disabilities and sleeping — human factors that would be relevant to an accidental fire, but not necessarily to an arson.[8]

Ms. Sowards also relies on the report of James Munger, an expert who reviewed Mr. Eley's report but did not conduct an on-site investigation. (Docket No. 64 at 3.) Mr. Munger concluded that there was "no scientifically valid evidence" to support Mr. Eley's opinions, and that Mr. Eley's conclusions were based on "nothing more than conjecture, misinterpretation and scientifically discredited fire investigation myths." (Docket No. 66 Ex. E at 14.) Mr. Munger concluded that "the origin and cause of this fire is appropriate [*sic*] classified as 'undetermined.'" (Docket No. 66 Ex. E at 15.) Although Mr. Munger's analysis and conclusion

---

[8]Under the heading "Human Factors Contributing to Ignition," the fire department report form lists "Asleep," "Possibly impaired by alcohol or drugs," "Unattended person," "Possibly mental [*sic*] disabled," "Physically Disabled," "Multiple persons involved," and "None." The box next to "None" was checked. (Docket No. 66 Ex. D.) Additionally, under the heading "Cause of Ignition," the fire department report lists several possible causes, including "Intentional," "Unintentional," "Failure of equipment or heat source," "Act of nature," "Cause under investigation," and "Cause undetermined after investigation." None of the boxes corresponding to any of those possible causes was checked. (Docket No. 66 Ex. D.)

8

may well raise questions as to Mr. Eley's investigation and conclusions, those questions need not be addressed here, as they only confirm that factual issues as to the fire's incendiary origin exist, which may not be resolved on summary judgment.

Finally, Ms. Sowards suggests that the fire might have been caused by an electrical problem with her stove, or by accident, as her children used the stove to cook on the morning of the fire.[9]  (Docket No. 64 at 1-2.)  Grange disputes the argument that the stove was not properly maintained or that it was left on, citing testimony provided by Ms. Sowards' children themselves.  (Docket No. 89 ¶¶ 4-6.)  Although Ms. Sowards' argument that the fire was caused by a malfunction or because the stove was left on is certainly plausible, the evidence presented by Grange that the fire was of an incendiary origin nevertheless is sufficient to survive the plaintiff's summary judgment motion.

B.     *Opportunity*

Proof of an individual's residence on the property can establish the opportunity element of an arson defense.  *McReynolds*, 815 S.W.2d at 212; *see also Mathis*, 1992 U.S. App. LEXIS 7130, at *8 (holding that there was "ample evidence" of opportunity where insureds were "in sole control of the house" and "neither saw nor heard anyone else around the house nor saw any sign of forced entry").  Additionally, as there exist means of delaying the start of a fire, an insured may not necessarily disprove the opportunity element merely by demonstrating that he or she was not present at the house when the fire took place.  *See McReynolds*, 815 S.W.2d at 212-

---

[9]In support of this argument, Ms. Sowards notes that her son attempted to repair the stove's wiring three or four weeks prior to the fire and that both she and her daughter had been shocked after touching a stainless steel spoon to the stove.  (Docket No. 64 at 1-2.)  She also notes that, on the day of the fire, two of her younger children had used the stove to cook biscuits and scrambled eggs, and that a melted aluminum skillet was found on or near the stove after the fire, suggesting that a burner may have been left on.  (Docket No. 64 at 1.)

9

13.  "It is not necessary for [the insurer] to show that [the plaintiff] was actually on the scene and struck the match."  *Guess*, 2007 U.S. Dist. LEXIS 73368, at *23; *see also McConkey v. Cont'l Ins. Co.*, 713 S.W.2d 901, 902-04 (Tenn. Ct. App. 1984) (reversing trial court ruling that insurer had not established arson defense and holding that circumstantial evidence established opportunity element, even though plaintiffs were not home at the time of the fire, having left approximately fifteen to forty-five minutes prior to the fire).

Here, there is substantial, albeit circumstantial, evidence that Ms. Sowards had the opportunity to set the fire.  There is no dispute that Ms. Sowards lived at the property in question, and she acknowledges that she and her son, Jordan, were the last people she knows to have been inside the house on the morning of the fire.  (Docket No. 93 ¶ 38.)  She maintains that she was en route to Alabama at the time of the fire.  (Docket No. 64 at 3-4.)  However, as the court alluded in *McReynolds*, the existence of timing devices means that Ms. Sowards could well have been responsible for the fire, despite the fact that she was not physically present at the time. 815 S.W.2d at 212 ("[T]he generally recognized fact that there are facilities for delayed start of a fire is a proper matter for judicial notice.").  Ms. Sowards relies on *Zaharias v. Vassis*, No. 01-A-01-9207-CH-00266, 1993 Tenn. App. LEXIS 65 (Tenn. Ct. App. Jan. 22, 1993), where the court held that an insurer had not established the opportunity element of its arson defense because there was no evidence that the insured was present at the time of the fire nor that someone had started the fire on his behalf.  In that case, however, there was not even a suggestion that a timing device was used.  *Id.* at *6.  Here, Mr. Eley's report theorizes that the stove may have been used as a timing device.[10]  (Docket No. 66 Ex. F at 2, 5.)

---

[10]Additionally, Mr. Eley testified at his deposition that a skillet found near the stove may have been used in conjunction with the stove as a timing device.  (Docket No. 90 Ex. 11 at 94-

10

In addition, even if a timing device were not used, it is nevertheless reasonable to infer that Ms. Sowards had the opportunity to start the fire. Ms. Sowards herself acknowledges that she may have left for Alabama as late as 10:30 a.m. (Docket No. 64 at 1; Docket No. 89 ¶ 1.) Although the fire was not reported to the fire department until 11:15 a.m., it does not strain credulity to imagine that a fire set at 10:30 might not reach such a state as to be noticed and reported until forty-five minutes later. Finally, there is little evidence that anyone other than Ms. Sowards had the opportunity to set the fire; several of Ms. Sowards' children testified that the house was locked when they left on the morning of the fire (Docket No. 90 Ex. 4 at 5, Ex. 5 at 20, Ex. 6 at 9), and Mr. Sowards stated in his EUO that he kicked in a door on the morning of the fire that appeared to be intact and showed no signs of forced entry (Docket No. 75 at 61).

Therefore, Grange has presented sufficient evidence such that a reasonable jury could conclude that Ms. Sowards had opportunity to set the fire.

C.      *Motive*

Here, as in many arson cases, Grange argues that Ms. Sowards "had a clear motive to intentionally cause the fire loss in question, as [she] was in a very difficult financial situation following her divorce and raising numerous children." (Docket No. 68 at 2.) Evidence of financial hardship may establish motive. *See, e.g.*, *McReynolds*, 815 S.W.2d at 213 (insured owed $10,000 due the day after the fire, his "employment and income were not suggestive of a solid economic condition," and he paid his heating bill "irregularly"); *Huff v. State Farm Fire & Cas. Ins. Co.*, 716 S.W.2d 927, 928 (Tenn. App. 1986) (insureds had "undisputable, serious financial difficulties," including an inability to sell their house and the prospect of paying two

96.)

11

mortgages); *Smith v. Fireman's Fund Ins. Co.*, No. 92-6540, 1994 U.S. App. LEXIS 423, at *3,

*13 (6th Cir. Jan. 7, 1994) (insured experienced negative cash flow in six years prior to fire, and

"extreme negative cash flow" in two years prior to fire); *Mathis*, 1992 U.S. App. LEXIS 7130, at

*8-*10 (insureds' bank account was depleted, they had difficulty selling their house, $12,000 in

credit card debt, and had attempted to negotiate longer payment period on car loan); *Arms*, 731

F.2d at 1251 (insured was "fairly well strapped financially," was in arrears on one debt and had

to refinance another, and had lost a source of income). Moreover, a court may consider "[a]ll

competent evidence tending to prove arson . . . including 'evidence of the insured's financial

condition, evidence of the removal of personal property from the burned buildings shortly before

the fire occurred, and evidence of the value of the property destroyed." *Huff*, 716 S.W.2d at 928

(citing 46 C.J.S., *Insurance*, § 1338(b) (1946)).

   In support of its defense, Grange relies again on circumstantial evidence that Ms.

Sowards was experiencing severe financial difficulties at the time of the fire. It is undisputed

that Ms. Sowards had become solely responsible for the mortgage on the property on September

1, 2005, less than three months prior to the fire, and had to support seven minor children. There

is some confusion, however, over the question of whether Ms. Sowards' mortgage payments

were up-to-date at the time of the fire and whether the house was in foreclosure at that time.

Grange alleges that the house was in foreclosure at the time of the fire (Docket No. 88 at 16-17),

while Ms. Sowards argues that it was not (Docket No. 64 at 5; Docket No. 89 ¶ 21). During her

EUO, however, Ms. Sowards herself acknowledged that she was two or three months behind on

her mortgage payments at the time of the fire. (Docket No. 78 at 46.) Additionally,

Countrywide, the mortgagee, sent Ms. Sowards a "Notice of Default and Acceleration" on

November 16, 2005, just weeks prior to the fire.[11]  (Docket No. 90 Ex. 9 at 2105-06.)  Ms.

Sowards relies on notes maintained by Grange that indicate that Mr. Kennedy reviewed legal

records revealing that "the loan was brought up to date [prior to the fire]."  (Docket No. 70 Ex. at

671.)  Mr. Kennedy, however, testified that he recalled "a problem" with the foreclosure status

of the house prior to the fire, although he could not recall whether the house was under

foreclosure at the time.  (Docket No. 70 at 71-72.)  Regardless of the contents of Grange's claim

notes, at the very minimum, the evidence is unequivocal that Ms. Sowards was two or three

months behind in her mortgage payments at the time of the fire and that she had received at least

three Notices of Default and Acceleration pertaining to the property in the year prior to the fire,

most recently on November 16, 2005.  Additionally, Grange has produced evidence that the size

of the insurance policy on the house exceeded the size of the mortgage and, that, as in many

arson cases, Ms. Sowards was burdened by "a large unpaid mortgage on the subject property and

an even larger insurance policy which would more than cover the indebtedness and provide the

insured with extra cash."[12]  *Guess*, 2007 U.S. Dist. LEXIS 73368, at *26.

Additionally, there is further evidence of Ms. Sowards' distressed financial state.

Grange's investigation revealed that two other properties owned by Ms. Sowards and Mr.

Sowards had been foreclosed and sold at auction in the months prior to the fire.  (Docket No. 90

Ex. 8.)  Ms. Sowards testified that she was dependent on child support payments from her ex-

husband "in order to do anything."  (Docket No. 78 at 30.)  Although Ms. Sowards asserts that

---

[11]Countrywide had sent Ms. Sowards two previous Notices of Default and Acceleration
on March 20, 2005 and October 17, 2005.  (Docket No. 90 Ex. 9 at 2102-03, 2108-09.)

[12]Although Ms. Sowards speculated in her deposition that she thought she might be
underinsured on the house (Docket No. 69 Ex. 12 at 54), the evidence demonstrates otherwise.
At the time of the fire, the principal on the mortgage was $105,002.27 (Docket No. 90 Ex. 9 at
2140) and the insurance covered no less than $145,511.00 (Docket No. 78 Ex. 7).

she sold leather goods online and was employed at Tandy Leather (Docket No. 89 ¶ 18), her personal income tax forms from 2005 indicate that she lost money from her on-line business and that her total income for the entire year 2005 was just over $700. (Docket No. 78 Ex. 4.) Additionally, Ms. Sowards stated that, just prior to the fire, she was attempting to obtain a distribution from her 401(k), which she intended to use to refinance the house and reduce her monthly mortgage payment, but that she had difficulty obtaining the distribution and had not received the funds at the time of the fire. (Docket No. 78 at 28, 44-45.) Finally, it is worth noting that, to Ms. Sowards' credit, she did not have any consumer credit card debt, although a recent application for a credit card had been denied. (Docket No. 78 at 78.)

Ms. Sowards relies on *Walters v. Tennessee Farmers Mutual Insurance Co.*, 873 S.W.2d 691 (Tenn. Ct. App. 1993), in support of her claim that summary judgment is appropriate with respect to Grange's arson defense. However, *Walker* is inapposite. In that case, the court held that the insurer had not established the motive element of its arson defense because, although the insured's financial situation "appear[ed] less than 'solid,'" there was evidence that the insureds were receiving financial assistance from family that enabled them to pay their debts regularly. *Id.* at 693. The court also noted that there was no evidence that the insureds had attempted to safeguard their valuables prior to the fire. *Id.* As in *Walters*, there is no evidence that Ms. Sowards made an attempt to safeguard any of her family's valuables prior to the fire, which is often the case where an insurer raises an arson defense,[13] *e.g.*, *McReynolds*, 815 S.W.2d at 213; *Huff*, 716 S.W.2d at 929. However, unlike the plaintiff in *Walker*, Ms. Sowards has not introduced any evidence to show that her financial difficulties were relieved by assistance from

---

[13]Although Grange nominally disputes whether Ms. Sowards safeguarded any valuables prior to the fire, there is virtually no evidence on this point. (*See* Docket No. 89 ¶ 23.)

14

family or friends, and, though she was attempting to obtain a distribution from her 401(k) to refinance her mortgage and alleviate some of her financial difficulties, the fact is that she had trouble obtaining those funds and had not received them at the time of the fire.

In addition to this evidence of Ms. Sowards' financial difficulties, the defendant also obtained evidence from a number of third parties indicating that Ms. Sowards may have been responsible for the fire.[14]  Doug Hall, one of Ms. Sowards' neighbors, contacted Mr. Eley and reported that Tracy Smith, Ms. Sowards' ex-boyfriend, had told Mr. Hall that, a few weeks prior to the fire, Ms. Sowards had asked Mr. Smith how to burn her house down.  (Docket No. 66 Ex. 6 at 4.)  Mr. Smith himself also contacted a representative of Grange and advised the representative that he believed Ms. Sowards had set the fire.  (Docket No. 70 at 62-64, Ex. at 663.)  One of Grange's investigators subsequently contacted Mr. Smith about his statement, and Mr. Smith confirmed that he had discussed how to start a fire with Ms. Sowards.  (Docket No. 71 at 76-79.)  Additionally, Mr. Hall informed Grange that he noticed the fire and called 911, and that he believed "something did not look right about the fire."  (Docket No. 70 Ex. at 657.)  Finally, an investigator spoke with a convenience store clerk who stated that she had heard that Ms. Sowards had set the fire.  (Docket No. 71 at 82-83.)

_____

[14]Ms. Sowards objects to all of these assertions as inadmissible hearsay.  (Docket No. 93 ¶¶ 8, 9, 16, 21-23, 28, 34, 35.)  Grange relies on these statements, however, not to prove the truth of the matter asserted — that Ms. Sowards was responsible for setting the fire — but rather to demonstrate the effect of the statements on Grange in the course of its investigation.  As such, the statements are not, by definition, hearsay.  *See* Fed. R. Evid. 801(c) ("Hearsay is a statement . . . offered in evidence to prove the truth of the matter asserted.").  To the extent that Ms. Sowards has objected to certain other statements contained in the Defendant's Statement of Undisputed Facts as constituting hearsay, statements not based on personal knowledge, or compound statements (Docket No. 92 at 7-8), the court would only note that it is not relying on any of those particular statements in reaching the conclusions expressed in this memorandum.

15

In light of all of the evidence of Ms. Sowards' financial difficulties, as well as the statements of these third parties,[15] Grange has provided sufficient evidence to establish that a genuine issue of material fact exists as to the motive element of Grange's arson defense. As there also exist genuine issues of material fact with respect to the incendiary origin of the fire and Ms. Sowards' opportunity to set the fire, summary judgment for Ms. Sowards with respect to her breach of contract claim would be inappropriate.

## III.    Bad Faith Refusal to Pay Insurance Claim

Grange seeks summary judgment with respect to Ms. Sowards' claim that Grange refused in bad faith to pay her insurance claim. (Docket No. 68 at 3-12.)

Tennessee law provides that an insurer is liable to an insured when the insurer, acting in bad faith, fails to pay the insured's claim promptly. The relevant statute states:

> The insurance companies of this state . . . in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

---

[15]In addition to alleging a financial motive, Grange asserts that Ms. Sowards had a poor relationship with her ex-husband, who lived nearby, and that her desire to move further away from him establishes motive. (Docket No. 88 at 19-20.) Although there is some indication in the record of hostility between Ms. Sowards and Mr. Sowards, many divorced couples experience such hostility and may wish to live further from their ex-spouses, but that alone does not establish motive.

16

Tenn. Code Ann. § 56-7-105. To establish a claim under the statute, a plaintiff must demonstrate "(1) that the insurance policy, by its terms, became due and payable; (2) that a formal demand for payment was made; (3) that [the insured] waited sixty days after making demand before filing suit; and (4) that [the insurer's] refusal to pay was not in good faith." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) (citing *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)). The insured bears the burden of proving bad faith on the part of the insurer. *Id.* Here, the key question is whether Grange's decision not to pay Ms. Sowards' claim was not made in good faith.

An insurer's refusal to pay is in good faith, and thus the insurer is not liable under the bad faith statute, if the refusal to pay "rests on legitimate and substantial legal grounds." *Id.* (quotation and citation omitted). Additionally, a delay in payment does not constitute bad faith where "there is a genuine dispute as to the value, no conscious indifference to the claim, and no proof that the insurer acted from 'any improper motive.'" *Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co.*, 849 F.2d 245, 249 (6th Cir. 1988) (citing *Palmer*, 723 S.W.2d at 126). Moreover, if an insurer asserts a defense in good faith, the bad faith penalty may not be imposed even if the defense is unsuccessful. *Palmer*, 723 S.W.2d at 126; *Zientek v. State Farm Int'l Servs. Inc.*, No. 1:05-CV-326, 2006 U.S. Dist. LEXIS 18418, at *4 (E.D. Tenn. Apr. 10, 2006). "To show [the insurer] acted in bad faith, [the insured] must show there were no legitimate grounds for disagreement about the coverage of the insurance policy." *Zientek*, 2006 U.S. Dist. LEXIS 18418, at *4.

Although Ms. Sowards makes a number of arguments in apparent support of her assertion that Grange's failure to pay her claim was not in good faith, these allegations are either inconsistent with the record, unsupported by the evidence, or simply do not constitute evidence

of bad faith.  Ms. Sowards first questions Grange's decision to hire Mr. Eley, complaining that Grange frequently hired Mr. Eley, that Mr. Eley was hired in part because he is a competent witness at trial, and that, in approximately half of the cases on which he works for Grange, Mr. Eley determines a fire to have been intentionally set.  (Docket No. 92 at 9-10.)  None of these facts establishes bad faith, however.  Grange may well have hired Mr. Eley because it believed him to be competent, and his skill as a witness is certainly a valid consideration.  Even though he returned findings of arson half the time, Ms. Sowards presents no evidence to suggest that those findings were erroneous or the result of bias — it may well be that arson is, in fact, the cause in half of the cases on which Mr. Eley works.

Ms. Sowards also objects to the manner in which Grange conducted its investigation and made the determination to deny her claim, asserting that she was not informed that Grange was conducting an investigation, that one of Grange's investigators spent a mere day investigating in the Vanleer area, that, after receiving Mr. Eley's report, Grange nevertheless informed her that it was going to replace her house, that Grange was "secretly building a case against her," and that she fully cooperated with Grange's investigation.  (Docket No. 92 at 10.)  However, it is hard to imagine how Ms. Sowards could be unaware of an investigation when she appeared for an EUO at Grange's request on May 25, 2006.  Additionally, Grange's claim notes indicate that, as early as December 1, 2005, just days after the fire, one of Grange's representatives contacted Ms. Sowards and "[a]dvised her don't want to put time limit on claim, depends on the investigation and getting information from them."  (Docket No. 70 Ex. at 658.)  Ms. Sowards also ignores the fact that the investigator's one-day visit to the Vanleer area was but one aspect of Grange's investigation, which was, in fact, conducted over the course of several months, as is evidenced by the extensive notes that Grange maintained documenting its investigation and other work on

18

Ms. Sowards' claim. (Docket No. 70 Ex. at 663-83.) Further, there is no evidence that Grange's statements about its intentions to replace her house were made in bad faith, rather than simply reflecting the fact that Grange was, in fact, acting in good faith to provide assistance to Ms. Sowards under the terms of her policy, even as Grange simultaneously conducted its investigation into the cause of the fire. As for Ms. Sowards' allegation that Grange was "secretly building a case against her," not only was it no secret that Grange was investigating the fire, but, to the extent that the results of that investigation pointed to arson, Grange was certainly entitled to build a case demonstrating that this conclusion was reached in good faith. Finally, although Ms. Sowards alleges that she fully cooperated with Grange's investigation, that alone does not establish Grange's bad faith, given the substantial evidence on which Grange based its conclusion that Ms. Sowards was responsible for the fire.[16]

Ms. Sowards next asserts that Grange ignored information that called into question its conclusion that the fire was the result of arson. She claims that, on the day that he submitted his report concluding that the fire was of an incendiary origin, Mr. Eley also provided Grange with information that contradicted the findings in his report. (Docket No. 92 at 10.) According to Grange's claim notes, on December 6, 2005, Mr. Eley informed Mr. Kennedy about his findings,

---

[16]Ms. Sowards argues that, in light of her cooperation, Grange's refusal to pay her claim constitutes bad faith despite the existence of circumstantial evidence suggestive of arson, as was the case in *McColgan v. Auto-Owners Ins. Co.*, No. W2002-00114-COA-R3-CV, 2002 Tenn. App. LEXIS 720 (Tenn. Ct. App. Oct. 11, 2002). In *McColgan*, however, the court noted that, in addition to cooperating with the insurer's investigation, the insured had demonstrated that "the record contain[ed] no evidence connecting him to the fire or its cause." *Id.* at *13. Here, by contrast, the record contains significant evidence connecting Ms. Sowards to the fire to the extent that she may have been at the house as little as forty-five minutes before the fire department was summoned and that several individuals reported that she was involved in setting the fire. Moreover, Ms. Sowards had a duty under the policy to submit to an examination under oath, if requested to do so, and to cooperate in the investigation of the loss.

19

including that the "lab analysis indicates that all samples were negative" but that "all indications point toward the stove in the kitchen" and that "the remains of an aluminum skillet was found in the debris which could indicate that stove was left on." (Docket No. 70 Ex. at 661.) Mr. Eley also informed Mr. Kennedy that, "due to the circumstances surrounding the loss more investigation will be needed." (Docket No. 70 Ex. at 661.) Ms. Sowards latches on to the claim notes' description of Mr. Eley's comments, notwithstanding the fact that the description is obviously a shorthand notation of a much longer and more detailed conversation. She also ignores the fact that the notation was made months before Grange ultimately denied Ms. Sowards' claim, having conducted additional investigation, just as Mr. Eley recommended. Additionally, it is worth noting that, as Ms. Sowards points out, the fire report indicated that the cause of the fire was undetermined and that no human factors contributed to the fire, in contrast to the conclusions reached by Mr. Eley and, subsequently, by Grange. But, as discussed *supra* Section II.A, the value of the fire report is limited, especially given the extensive investigation subsequently conducted by Grange and Mr. Eley. Moreover, the fact that Grange has produced sufficient evidence to survive summary judgment with respect to its arson defense lends further support to this conclusion.

Ms. Sowards also claims that the loss review committee, which ultimately made the decision to deny her claim, was not provided accurate information with respect to the foreclosure status of the house, and that the committee was not presented with "exculpatory" evidence, including the facts that no accelerants were found at the scene, that she was not behind in her bills, that she had no other place to live, that the insurance coverage was less than the value of the house, and that she was expecting to receive a distribution from her 401(k) at the time of the fire. (Docket No. 92 at 6, 10-11.) However, the record, including Ms. Sowards' own testimony,

belies her argument. First, Mr. Eley's report made clear that laboratory tests did not reveal the presence of any accelerants on samples taken from the scene of the fire but, presumably, the committee found other aspects of Mr. Eley's report and its own investigation indicative of arson. Additionally, Ms. Sowards testified that she was behind in her mortgage payments at the time of the fire, contrary to her assertion that she was not behind in her bills, and Grange has presented evidence demonstrating that the value of the insurance policy was, in fact, greater than the indebtedness on the house. Moreover, it is indisputable that Ms. Sowards received three Notices of Default and Acceleration in the year prior to the fire, most recently on November 16, 2005. Finally, the fact that Ms. Sowards was expecting to receive a distribution from her 401(k) — a distribution that she had not yet received — can hardly be considered exculpatory, nor is the fact that she and her children had no other place to live.[17] In sum, Ms. Sowards has pointed to no evidence in the record or elsewhere to support the bald assertion that Mr. Kennedy or anyone else employed by Grange obfuscated relevant information in the course of the investigation or in providing information to the loss review committee prior to its determination to deny Ms. Sowards' claim.

In addition to complaining about the information presented to the loss review committee, Ms. Sowards suggests that the committee improperly relied on the statements of third parties in making its determination — referring to the fact that Mr. Hall related a conversation he had with Mr. Smith to Mr. Eley. (*See* Docket No. 92 at 86.) Once again, however, Ms. Sowards' argument is refuted by incontrovertible evidence that two representatives of Grange spoke

---

[17]Additionally, as Grange points out, it had a duty to provide Ms. Sowards with assistance following the fire (Docket No. 95 at 14) and had, in fact, provided her with temporary housing even as it was investigating the cause of the fire (*see, e.g.*, Docket No. 70 Ex. at 660-61, 664-65, 667-68 ).

personally with Mr. Smith. (Docket No. 70 at 62-64, Ex. at 663; Docket No. 71 at 76-79.) Ms. Sowards also calls into question the quality of Grange's investigation, alleging that recorded interviews that Grange conducted with her and her son, Jordan, shortly after the fire were lost when one of Grange's computers crashed. (Docket No. 92 at 2.) As with her other arguments, however, not only does she not point to any evidence in support of this allegation as a factual matter, but she also does not provide any evidence to suggest that the loss of these records was somehow malevolent or otherwise indicative of Grange's unfair or deceptive conduct.

Ms. Sowards also raises questions about Grange's communications with the Dickson County Sheriff's Office during the course of the investigation, alleging that representatives of Grange attempted to encourage the Sheriff's Office to "further prosecute" Ms. Sowards. (Docket No. 92 at 10.) The evidence, however, does not support this characterization. Ms. Sowards claims that the Sheriff's Office received a "suspicious anonymous call" suggesting that the fire was arson (Docket No. 92 at 3), seemingly implying that this call was made by a representative of Grange, despite the lack of any evidence to this effect. Additionally, Ms. Sowards argues that representatives of Grange informed the Sheriff's Office that Grange believed the fire to be suspicious (Docket No. 92 at 3-4), intimating that Grange encouraged the Sheriff's Office to conduct an investigation when the Sheriff's Office had not identified a need for an investigation.[18] Ms. Sowards also alleges that Grange "tried to get [the Sheriff's Office] to take

---

[18]In support of the assertion that the Sheriff's Office had not identified a need for an investigation, Ms. Sowards relies on a portion of the Sheriff's Office incident report, in which a deputy at the scene noted that the fire did not seem suspicious and that he did not smell accelerants. His entire statement, however, was that "Thinking back of [*sic*] the fire I did not see anything suspicious of the fire nor did I smell any type of accelerates such as gasoline or fuel, But *at the time I was not acting nor in the mind set of investigating a suspicious house fire*." (Docket No. 92 Ex. D at 2 (emphasis added).)

22

witness statement [*sic*] and further prosecute Ms. Sowards." (Docket No. 92 at 10.) However, these allegations are unsupported by the record. Although the Sheriff's Office incident report does reflect that an investigator for Grange spoke to a detective and "advised that he wanted me to take Ms. Sowards' statement," the detective testified that the investigator was so much "encourag[ing]" an investigation or criminal charges, but rather informing the Sheriff's Office of Grange's investigation and offering assistance. (Docket No. 69 Ex. 5 at 12, 26-27.) Finally, Ms. Sowards complains that Grange failed to return correspondence from the Sheriff's Office indicating that the Sheriff's Office had concluded there was no evidence of a crime. (Docket No. 92 at 4.) This failure to return correspondence, however, is in no way indicative of Grange's "attempting to sway" the Sheriff's Office investigation, as Ms. Sowards contends, and the facts that Ms. Sowards alleges, even taken as a whole, do not create a reasonable inference that Grange somehow interfered with or manipulated the course of the Sheriff's Office investigation or that its actions were an attempt to harass Ms. Sowards.[19]

Despite Ms. Sowards' assertions to the contrary, there is precious little evidence of bad faith, and certainly evidence insufficient for Ms. Sowards to carry her burden with respect to bad faith. In fact, the evidence establishes quite the opposite — that Grange had a good faith basis for denying Ms. Sowards' claim. Grange undertook an investigation of the claim, as is standard procedure, and hired Mr. Eley, a cause and origin expert. Mr. Eley concluded that the damage caused by the fire could not have occurred without the use of an accelerant and concluded that

---

[19]It is also worth noting that, to the extent that Ms. Sowards may attempt to rely on the fact of her nonprosecution for arson in support of her position in this litigation, the Sixth Circuit has held that evidence of nonprosecution for arson is not admissible in a civil case for recovery of insurance proceeds. *Kelly's Auto Parts, No. 1, Inc. v. Boughton*, 809 F.2d 1247, 1252-53 (6th Cir. 1987).

23

the fire was of incendiary origin. Additionally, Grange's investigation revealed that Ms. Sowards had the opportunity to set the fire in that she may have been at home as few as forty-five minutes before the fire was reported and that she was experiencing financial difficulties at the time, establishing a possible motive for the arson.[20] Additionally, Grange received information from no fewer than three individuals suggesting that the fire was suspicious; most notably, an investigator for Grange spoke with Ms. Sowards' ex-boyfriend, who confirmed that Ms. Sowards had asked him how to burn her house. All of this information quite reasonably led Grange to believe in good faith that it was justified in denying Ms. Sowards claim on the basis of an arson defense. Even if this was made in error, it certainly was not made in bad faith. *See Palmer*, 723 S.W.2d at 126.

As Grange has established that there is no genuine issue of fact as to Ms. Sowards' claim of bad faith refusal to pay an insurance claim, summary judgment in its favor is appropriate.

## IV. Tennessee Consumer Protection Act

Grange also seeks summary judgment with respect to Ms. Sowards' claim arising under the Tennessee Consumer Protection Act. (Docket No. 68 at 12-19.)

The Tennessee Consumer Protection Act ("TCPA") prohibits the use of "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). The statute provides a non-exhaustive list of unfair or deceptive acts that constitute violations of the statute and contains a catch-all provision prohibiting "any other act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-105(b). The statute provides for actual damages when a person "suffers an ascertainable loss of

--------

[20] The evidence of incendiary origin, opportunity, and motive that was revealed by Grange's investigation is discussed in further detail *supra* Section II.

24

money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful."[21]  Tenn. Code Ann. § 47-18-109(a)(1). Additionally, the statute provides for treble damages if the use of an unfair or deceptive act or practice is shown to be willful or knowing.  Tenn. Code Ann. § 47-18-109(a)(3).  In *Myint v. Allstate Insurance Co.*, 970 S.W.2d 920, 926 (Tenn. 1998), the Tennessee Supreme Court held that insurance companies are subject to the TCPA, despite the existence of complementary statutes regulating the insurance industry, such as the bad faith refusal to pay statute.

Ms. Sowards first alleges that Grange violated the TCPA in denying her claim.  (Docket No. 92 at 14.)  Even if the denial of the claim were erroneous, an erroneously denied claim does not establish a violation of TCPA in the absence of some deceit or misleading conduct.  *See Myint*, 970 S.W.2d at 926; *Williamson v. Aetna Life Ins. Co.*, No. 04-2851 B, 2005 WL 3087861, at *6 (W.D. Tenn. Nov. 17, 2005) ("Erroneous denial of a claim . . . unaccompanied by deceit or other misleading conduct, does not constitute deception or unfairness." (citation and quotation omitted)).  *Myint* is instructive.  There, the plaintiffs brought suit after the insurer refused to pay a claim based on its belief that the plaintiffs had intentionally set fire to their property.  *Myint*, 970 S.W.2d at 923.  The Court held that the insurance company's handling of the claim was not unfair or deceptive and that there existed no evidence of "an attempt by [the insurer] to violate

---

[21]With respect to the question of whether intent is required to establish a TCPA claim, the Sixth Circuit has stated that the TCPA "does not require deceptive intent, which means a plaintiff may recover damages even for negligent violations."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 569 (6th Cir. 2003) (citing *Menuskin v. Williams*, 145 F.3d 755, 767-68 (6th Cir. 1998)).  However, the Tennessee Supreme Court "has stated that 'proof of deception' may be 'dependent upon evidence of intent or knowledge.'" *State Indus. v. Twin City Fire Ins. Co.*, 158 Fed. Appx. 694, 697 (6th Cir. 2005); *see Ganzevoort v. Russell*, No. 01S01-9602-CV-00040, 1997 Tenn. LEXIS 406, at *2 (Tenn. Aug. 25, 1997) (stating that the "contention, that under the [TCPA] proof of deception is never dependent upon evidence of intent or knowledge, is contrary to the plain language of the Act.").

25

the terms of the policy, deceive the [plaintiffs] about the terms of the policy, or otherwise act unfairly," noting that the denial of the claim in that case "was [the insurer's] reaction to circumstances that [it] believed to be suspicious." *Id.* Such actions, the Court held, did not constitute a violation of the TCPA. *Id.*

Here, Ms. Sowards has not alleged any deceit or misleading conduct that would establish a TCPA violation. Moreover, the evidence indicates that Grange made the decision to deny the claim on the basis of information suggesting arson and that its decision was not made in bad faith, as discussed *supra* Sections II and III. *See Williamson*, 2005 WL 3087861, at *6 (denying TCPA claim where circumstances were such that insurer had a good faith basis for questioning insured's eligibility for coverage). Additionally, there is no evidence that the claim was denied on the basis of information that Grange knew to be false, as in a case on which Ms. Sowards relies in support of her allegation.[22] *See Rothberg*, 2008 U.S. Dist. LEXIS 24650.

In addition to her allegation that Grange wrongfully denied her claim, Ms. Sowards also alleges that Grange "was negligent in the manner it handled the investigation leading to the wrongful denial of the claim," and that Grange refused to investigate her claim and harassed her during the course of the investigation. (Docket No. 4 ¶¶ 100-02.) Although the *Myint* court did not state explicitly whether its holding applied to an insurance company's handling of a claim, the decision subsequently has been interpreted to apply in such circumstances. *See Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 822 (Tenn. 2003) (holding that plaintiff could pursue TCPA claim for insurance company's handling of claim); *Sparks v. Allstate Ins. Co.*, 98

_____

[22]Once again, though Ms. Sowards asserts that the loss review committee was provided with erroneous information about the foreclosure status of the house, the evidence does not support that allegation. *See* discussion *supra* Section III.

26

F. Supp. 2d 933, 938 (W.D. Tenn. 2000) ("[T]he court concludes that the Tennessee Supreme Court in *Myint* intended to permit actions under the TCPA for claims handling procedures and would so hold if squarely confronted with the issue."). Grange, however, attempts to distinguish *Gaston* on the grounds that the case arose from an insurer's failure to pay the plaintiff's uninsured motorist claim, arguing that the holding is limited to the uninsured motorist context. (Docket No. 68 at 15.) There is no reason, however, that the holding in that case should be so limited, nor that an insurer's failure to pay an insurance claim arising from a car accident involving an uninsured motorist is different in any meaningful way from an insurer's failure to pay an insurance claim arising from a fire that destroyed the insured's property.

While Grange attempts to distinguish *Gaston* on the basis of this meaningless difference, at the same time it relies on *Crossley v. National Fire Insurance Co. of Hartford*, 237 S.W.3d 652 (Tenn. Ct. App. 2007), while ignoring the substantial differences between that case and this one. Grange argues that *Crossley* "is the most recent, reported pronouncement by the Tennessee appellate courts on the issue of whether the TCPA applies to the handling of claims for property or casualty losses." (Docket No. 68 at 15.) Although Grange attempts to characterize *Crossley* as involving a simple insurance matter, the fact is that the underlying agreement in that case was not a simple insurance policy, but rather a complex indemnity agreement pursuant to which the defendant issued a payment and performance bond relating to the plaintiff's building construction contract with a third party.[23] *See Crossley*, 237 S.W.3d at 653-54. Although the

---

[23]During construction of the building, the plaintiff and the third party had a disagreement over the design of the project, and the third party terminated the plaintiff's contract. *Crossley*, 237 S.W.3d at 654. The defendant obtained another contractor to complete the project under the bond and conducted an investigation of the plaintiff's termination. *Id.* The plaintiff brought suit, alleging that "Defendant's investigation of [the project] and Defendant's treatment of Plaintiff prevented Plaintiff from obtaining bonds for future projects thereby harming Plaintiff's business

27

agreement may have constituted "insurance" as a technical matter, it was hardly comparable to the relatively straightforward consumer insurance policies at issue in *Myint*, *Gaston*, and here. Moreover, the *Crossley* plaintiff based its TCPA claim on the allegation that the defendant's investigation resulted in harm to the plaintiff's business reputation. *Id.* at 654, 657. Thus, the *Crossley* plaintiff's argument was not that the defendant's wrongful actions in the handling of the claim led to the denial of the claim, but rather that the defendant's wrongful actions harmed the plaintiff's future business interests. Additionally, in holding that the defendant's actions did not fall within the scope of the TCPA, as they occurred after the agreement was entered into, the *Crossley* court did not mention *Myint*, *Gaston*, or, indeed, any case involving a consumer insurance policy, *see id.*, and thus there is no indication that the ruling in *Crossley* has any effect on the holding of either *Myint* or *Gaston*, nor does this court see any reason that a single Court of Appeals case should be understood as undoing — intentionally or unintentionally — two well-reasoned opinions of the Tennessee Supreme Court.[24] Finally, Grange relies on language from *Myint* stating that the TCPA, the bad faith statute, and the Insurance Trade Practices Act are complementary statutes and argues that this language, when read in conjunction with *Crossley*, requires the conclusion that the TCPA does not apply to claims relating to the handling of the claim. (Docket No. 68 at 15-16.) This reading of *Myint*, however, does not square with the

---

and reputation." *Id.*

[24]Grange further argues that *Crossley* has, in effect, some enhanced precedential value because the Tennessee Supreme Court denied permission to appeal the case and because the opinion was published, relying on Tennessee Supreme Court rules governing the publication of intermediate appellate decisions. (Docket No. 95 at 15-17.) However, Grange cites no authority to support the argument that the denial of permission to appeal or the publication of a decision can imbue an opinion with some enhanced precedential value, and this court declines to so treat the *Crossley* decision.

28

court's subsequent ruling in *Gaston*, in which the Tennessee Supreme Court made clear that the TCPA applies to an insurer's handling of an insurance claim.

Despite Grange's rather gymnastic effort to demonstrate that the TCPA does not apply to an insurer's handling of claims, the fact is that summary judgment in favor of Grange is appropriate with respect to this claim for a much simpler reason: Ms. Sowards has not established a genuine issue of fact that Grange's actions in the handling of her claim were unfair or deceptive. Ms. Sowards alleges that Grange's handling of her claim constituted a violation of the TCPA for a number of reasons, including the fact that Grange, in reviewing and determining compensation for its investigators, considers an investigator's "mitigation rate," the portion of claims that are denied. (Docket No. 92 at 14.) As such, Ms. Sowards argues, the investigators have a "vested interest" in the outcome of each case. Despite Ms. Sowards' attempt to cast aspersions on Grange's review and compensation procedures, however, she has provided no evidence that the investigation into her claim was tainted by bias as a result of those procedures. She also complains that there was a process by which she could have appealed the committee's decision to deny her claim, but asserts that she was never informed of this. Even if that were the case, however, without more it does not establish that Grange's conduct was unfair or deceptive such that it constitutes a violation of the TCPA.

Most of the other allegations that Ms. Sowards makes with respect to her TCPA claim simply rehash the arguments she made with respect to her bad faith claim, discussed *supra* Section III. For instance, she again complains that the committee was provided with "false and misleading evidence" and that it was not provided with "exculpatory evidence." (Docket No. 92 at 14-15.) Once again, however, this allegation does not comport with Ms. Sowards' own testimony that she was, in fact, two or three months behind on her mortgage payments, or the

29

fact that she had received three Notices of Default and Acceleration that year, including one just weeks before the fire.

Ms. Sowards also again suggests that the investigation was flawed to the extent that Grange attempted to "sway" the Sheriff's Office to charge Ms. Sowards with arson in order to cloak their determination with credibility. (Docket No. 92 at 4.) But, as with her bad faith claim, this allegation is not supported by the evidence, which merely indicates that Grange had communications with the Sheriff's Office regarding the status of their investigation, and not that those communications represented an attempt to manipulate the Sheriff's Office investigation or harass Ms. Sowards.

The other arguments that Ms. Sowards repeats include her allegations about Grange's hiring of Mr. Eley, the manner in which Grange conducted its investigation, the fact that the loss review committee met in private and that there are no minutes or notes of the meeting, and the fact that the committee relied on the statements of third parties in reaching its conclusion. Despite these many arguments, however, none of them establishes that Grange violated the terms of her insurance policy, deceived her about the policy, or acted unfairly or deceptively in the course of investigating her claim or making the determination to deny her claim. As Grange has established that there is no genuine issue of material fact as to whether its actions in either denying Ms. Sowards' claim or in handling her claim violated the TCPA, summary judgment in favor of Grange on her TCPA claim is appropriate, obviating the need for any consideration of whether Ms. Sowards established damages under the TCPA or whether Grange's conduct was willful or knowing, warranting treble damages under the statute.

**V.     Negligence**

Finally, Grange seeks summary judgment with respect to Ms. Sowards' negligence claim. (Docket No. 68 at 19-21.)

Grange first asserts that Ms. Sowards' negligence claim must be dismissed because only statutory remedies are available to Ms. Sowards under *Myint*. However, Grange once again reads too much into *Myint*. In that case, the court held that the TCPA, the Insurance Trade Practices Act, and the bad faith statute constitute "*complementary* legislation that accomplishes different purposes" and that "the acts and practices of insurance companies are generally subject to the application of all three." *Myint*, 970 S.W.2d at 926 (emphasis in the original). On the basis of this language, Grange would have the court conclude that "actions against insurers in this context are limited to the above mentioned legislation," and that "extra-contractual actions," such as Ms. Sowards' negligence claim, are, essentially, preempted. (Docket No. 68 at 19-20.) But in making this argument, Grange ignores the *Myint* court's discussion of the statutes and the fact that the Insurance Trade Practices Act and the bad faith statute do not limit an insured's remedies, *Myint*, 970 S.W.2d at 925 ("We find nothing in either the Insurance Trade Practices Act or the bad faith statute which limits an insured's remedies to those provided therein."), as well as language in the TCPA stating that the remedies provided by that statute are "cumulative and supplementary to all other powers and remedies otherwise provided by law," Tenn. Code Ann. § 27-18-112, *cited in Myint*, 970 S.W.2d at 926. Additionally, Grange's argument that extra-contractual claims were limited to the bad-faith statute prior to *Myint* also fails. The cases Grange cites in support of this argument merely provide that Tennessee law does not recognize a tort of bad faith, but rather that such a claim must be brought under the bad faith statute; the cases do not provide that the bad faith statute is preemptive of Ms. Sowards' negligence claim, as Grange claims. *See Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615, 621 (Tenn. Ct. App.

31

1986); *King v. Mut. Life Ins. Co. of N.Y.*, 114 F. Supp. 700, 701-02 (E.D. Tenn. 1953); *Rice v. Van Wagoner Co.*, 738 F. Supp. 252, 255 (M.D. Tenn. 1990).

To establish a negligence claim, Ms. Sowards must demonstrate "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *E.g.*, *Coln v. City of Savannah, Tenn.*, 966 S.W.2d 34, 39 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991). In her complaint, Ms. Sowards asserted that Grange had "a duty to investigate the claim properly" and "a duty to pay valid claims," and that she suffered damages as a result of Grange's alleged breach of these duties. (Docket No. 4 at 14.) Her opposition to Grange's summary judgment motion reiterates the same essential allegations, but specifies that her claim is based particularly on her allegations relating to Grange's conduct of the investigation, failure to interview witnesses, presentation of false information to the loss review committee, and reliance on hearsay statements. (Docket No. 92 at 16.) She alleges that she was damaged "in the denial of her claim, mental stress, loss of enjoyment of life, and many other ways." (Docket No. 92 at 16.)

Again, Ms. Sowards presents little evidence that supports her claim. As has been discussed thoroughly in Sections II, III and IV *supra*, the evidence clearly and unequivocally demonstrates that Grange conducted a thorough investigation, interviewed witnesses, hired a cause and origin expert, took statements from Ms. Sowards, her ex-husband, and several of her children, and visited the Vanleer area, all before reaching a conclusion with respect to her claim. There is no evidence that Grange failed to interview any relevant witnesses, that its consideration of so-called hearsay testimony was inappropriate, particularly in light of the constellation of

32

information obtained by Grange that suggested arson, or that the loss review committee was provided with false information prior to making its decision.

As there is no genuine issue of fact as to whether Grange's actions constituted a breach of any duty it may have had to Ms. Sowards,[25] summary judgment is appropriate as to Ms. Sowards' negligence claim.

## CONCLUSION

For the reasons discussed herein, the Plaintiff's Motion for Partial Summary Judgment will be denied, and the Defendant's Motion to Dismiss and for Partial Summary Judgment on Plaintiff's Claims for Statutory Bad Faith Penalty, Tennessee Consumer Protection Act, Negligence, Defamation and Unjust Enrichment will be granted. The claim remaining for trial is the plaintiff's breach of contract claim.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[25]Grange asserts that Ms. Sowards' negligence claim actually constitutes a claim for negligent infliction of emotional distress, and argues that Ms. Sowards' claim should be dismissed on the grounds that she has failed to identify a medical expert to support damages under this theory and to establish serious and severe emotional injury. (Docket No. 68 at 20-21; Docket No. 95 at 20.) In support of this argument, Grange argues that the only damages alleged by Ms. Sowards are not recoverable under a negligence theory, but rather only would be recoverable under a theory of negligent infliction of emotional distress. (Docket No. 68 at 21.) The court sees no reason, however, to construe Ms. Sowards' claim in any manner other than the manner in which it was pleaded, and, to the extent that Ms. Sowards may have failed to allege damages recoverable under a negligence theory, that simply would establish one more basis for awarding Grange summary judgment on Ms. Sowards' negligence claim.

33